# Illinois Official Reports

## Appellate Court

---

### *People v. Lewis*, **2017 IL App (1st) 150070**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BARRON LEWIS, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-15-0070 |
| Filed<br>Rehearing denied | June 29, 2017<br>July 14, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-13229; the Hon. Kenneth J. Wadas, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Bradley Jarka, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Lisanne P. Pugliese, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Justices Howse and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Barron Lewis, was found guilty of aggravated criminal sexual assault in 2010 and sentenced to 15 years' imprisonment. In this appeal, defendant challenges the summary dismissal of his petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)). Defendant maintains that he presented an arguable claim of ineffective assistance of counsel based on counsel's failure to investigate his negative chlamydia test results and to present that evidence to the trial court in support of his contention that the victim's positive chlamydia test results should have been admitted.

¶ 2    The record shows that prior to trial, the trial court heard the State's motion *in limine* regarding various matters. Among other things, the State requested that the defendant be barred from introducing evidence that the victim, C.H., had tested positive for chlamydia. The trial court initially indicated that it would grant the State's motion because the test result "ha[d] no relevance" and because it was "the same as trying to bring in predisposition—sexual predisposition *** which we know the law absolutely blocks." Defense counsel, however, asked to be heard on that issue. Counsel acknowledged the "rape shield law" issue but contended that the victim's test results should be admitted. Counsel stated that "if she had chlamydia and the Defendant had sex with her as she is saying, unprotected sex, the fact that the Defendant never had chlamydia, never got chlamydia, and has been in jail and was tested for it even on his entry into the jail is all *** direct medical evidence that—that they did not have sexual intercourse." Counsel further argued that "the simple fact that she had a highly communicable disease which was not transferred to the Defendant is medically speaking some evidence indicating that sex between the two did not happen. So this takes it out of the rape shield example and puts it into the elemental right of the Defendant to present a defense on one of the critical issues in the case which is whether or not there was sex between these parties."

¶ 3    The State responded that the evidence "goes to the victim's past sexual history which is specifically prohibited in rape shield," and the court ruled, "Evidence of chlamydia is not going in or reference, rape shield law."

¶ 4    The remaining trial proceedings were summarized by a different panel of this court as part of defendant's direct appeal, which we will quote at length due to the nature of defendant's claims.

> "C.H. testified that on July 5, 2009, she and fellow college student, Amanda Richardson, had recently moved into an apartment building at 833 West Buena Street in Chicago. C.H. had returned to the building after work at approximately 5:30 p.m. C.H. sat on a bench in the patio area outside the building finishing a telephone call, when she was approached by Lewis. Lewis offered C.H. a drink, which she accepted and thanked him for.
>
> C.H. stated that after she finished her telephone call, she again thanked Lewis, who was listening to music on his boombox and smoking a cigar. Lewis invited her to sit with him and the two had a conversation. He spoke about his family and children, and his jazz club; she spoke about school, work, and her boyfriend. Lewis told her he lived two floors directly above her in the building.
>
> When it began to grow dark, C.H. decided to return to her apartment. Lewis stated he was also going inside to get batteries for his boombox. The two made small talk in

the elevator. C.H. testified that she was surprised when Lewis exited the elevator with her on the 12th floor. According to C.H., Lewis explained that he was interested in whether their apartments shared the same layout.

C.H. gave Lewis a brief tour of her apartment. Lewis asked whether she had any batteries, then went into her kitchen and poured them each shots of tequila. C.H. testified that she took a sip of the tequila, but poured the rest out because she did not want to get drunk. According to C.H., she had consumed only a glass of sangria and a sip of tequila that evening.

Furthermore, C.H. testified that Lewis then went into her living room and sat down on a futon. C.H. sat down on a futon across from him. Lewis got up, grabbed C.H.'s arm, and told her to sit next to him. Lewis also told C.H. she had a beautiful body. C.H. stated that she had been having a good time, but began to feel awkward and that Lewis, whom she had thought was funny, began to seem 'creepy.'

C.H. tried to get up from the futon, but Lewis pulled her back down next to him. Lewis again said that C.H. had a beautiful body, adding that she needed to show it off more. Lewis had C.H. stand up and then he removed her sweatshirt, under which she wore a t-shirt and scarf. After C.H. sat down again, Lewis tried to get her to kiss him and feel his penis and groin. C.H. repeatedly told Lewis that she had a boyfriend and that this situation was 'not okay.' Lewis told her that no one would love her the way he would. C.H. stated that Lewis continued to kiss her and tried to grab her hands. C.H. clenched her fists and pushed him away.

According to C.H., Lewis became aggravated and went back downstairs to the patio area to finish smoking his cigar. C.H. testified that she followed Lewis out to the patio, explaining that she thought she could get him to remain there or return to his apartment. C.H. stood behind Lewis as he smoked and conversed with other neighbors.

Lewis then told C.H. he needed to return to her apartment to retrieve his boombox. The two went back to her unit. C.H. stated that she thought Lewis would leave quickly, but he returned to the futon and again tried to kiss her and to have her feel his groin. According to C.H., Lewis was 'all over her.'

C.H. testified that she was crying and telling Lewis 'no.' Lewis forcibly removed C.H.'s sweatshirt. At some point while the two struggled, they knocked sangria onto the floor. C.H. tried to clean up the spill as a distraction, but Lewis carried her to her bedroom.

C.H. also testified that she was crying and yelling for him to stop, but Lewis forced her to remove all of her clothes. C.H. further testified that Lewis removed his clothes and tried to put his penis in her mouth, but she kept her mouth shut and turned her head away. According to C.H., Lewis struck her face, on her left cheek under her eye, and grabbed at her breasts, scratching her.

C.H. was then on her stomach and Lewis climbed on top of her. Lewis tried to insert his penis into C.H.'s anus, but he could not do so because C.H. was kicking. Lewis inserted his finger into C.H.'s vagina and he inserted his penis inside of her vagina. C.H. testified that she continued to tell Lewis to stop, but Lewis told her, 'I am going to show you what really fucking is about.' While Lewis was on top of her, he

occasionally pulled on her scarf, choking her. C.H. did not know whether Lewis ejaculated, but he eventually got off of her and seemed to fall asleep.

C.H. stated that she quickly dressed and then began hitting Lewis with her fists, demanding that he leave. C.H. testified that she knew that Amanda would be home soon and feared what Lewis might do to her. According to C.H., Lewis awakened and dressed in the living room.

C.H. heard Amanda fumbling with the door locks, although C.H. stated she had locked neither the door lock nor the deadbolt. Once Amanda entered the apartment, C.H. started to cry and told her they needed to leave. Amanda went into the bathroom to remove her contacts. C.H. stated that when Amanda emerged from the bathroom, Lewis was sitting on the futon, finishing dressing. C.H. testified that she repeated that they needed to leave and yelled at Lewis to leave.

The three left the apartment. Lewis got on the elevator with C.H. and Amanda. Lewis introduced himself to Amanda and shook her hand. According to C.H., Lewis told Amanda he had been trying to keep C.H. happy all night and that she needed to stop crying. When the elevator reached the first floor, C.H. ran from the building. Amanda caught up to C.H., who had fallen at the end of the block. C.H. would not let Amanda touch her. C.H. telephoned her mother, but was crying and screaming, so Amanda took the telephone. Amanda then telephoned the police, who arrived as C.H. and Amanda returned to their building.

C.H. testified that after she spoke to the police officers, she was transported to Thorek Hospital, where a sexual assault kit was assembled. C.H. told the doctor that Lewis inserted his finger into her vagina. She also told the doctor she did not know whether Lewis had worn a condom. C.H. then went to the police station, where she identified Lewis in a lineup. At trial, C.H. identified a photograph of herself in which there is a visible bruise under her left eye, which she stated Lewis caused.

In addition, C.H. testified that she sent a series of text messages to Amanda, her boyfriend Tony, and her friend Lamar, throughout the evening, until Lewis took the telephone from her and threw it across the room. C.H. identified enlarged photocopies of text messages sent between 5:40 p.m. and 10:40 p.m. on July 5, 2009. The text messages sent to Amanda, admitted into evidence as People's group exhibit No. 2, included the following ***:

'(5:40 p.m.) When r u coming home?

(5:41 p.m.) Omg something hilarious is happening! [C.H. testified that "OMG" is short for "oh, my God."]

(time not displayed) I cam home and was sittin on a bench and a guy walks over and hands me a sangria. Then give me a huge cigar. We r just sittin drinkin and smokin. I think hes gay.

(6:56 p.m.) Omg this guy is hilarious. Hes giving e advice on tone.

(6:58 p.m.) Omg I hope eh wot. Im kinda drunk. Come homeeee!!

(7:17 p.m.) Olg he wnts to come to my place. Come home!

(7:26 p.m.) Omg!

(7:29 p.m.) Hes in our place. But he knows I have a "bf"

(7:31 p.m.) Omg I kno. Ah wheres tone?!

- 4 -

(7:38 p.m.) ok dude im kinda creeped out. Don't txt or cll tone. Ima cll him in a min

(7:47 p.m.) Omg!

(7:48 p.m.) Ill let u kno

(8:09 p.m.) Ya. Mandee hes like hittin in me. Im drink and im scared

(8:38 p.m.) Omg mqndee im bout o cry hes like trying to be all ofr me!!. whn ill u be home?

(8:40 p.m.) Please hurry mand. I cant take thos. Tone isnt answerint.

(9:21 p.m.) Ya. Omg! Help. I hate his please hurry

(10:18 p.m.) Call lamarr tell him to come here. Tone wont txt or call me back'

C.H. also testified that she sent the following text messages to her boyfriend, Tony Vanderbilt:

'(7:51 p.m.) Heyy! What's shakin?

(10:22 p.m.) Babe I need help. This guy is in my apartmebt. Help me pleawe.'

C.H. further [testified] that she sent the following text messages to her friend, Lamar:

['](8:39 p.m.) Hwy ome im srunk. Hillhis guys teyin to get wav [C.H. testified that "wav" means "help."] me. Help.

(9:21 p.m.) Please

(9:35 p.m.) I need help

(9:43 p.m.) Ly house

(10:19 p.m.) Please help

(10:20 p.m.) This guy hes in my apartmet I nee help pleawe please lamarr come here please

(10:20 p.m.) Come help me please

(10:34 p.m.) please come to my house this guy ah gtg [C.H. testified that "gtg" means "got to go."]

(10:34 p.m.) please tell him to come'

In a sidebar, defense counsel objected to the text messages being admitted as substantive evidence, based on the trial judge's ruling *in limine*. Defense counsel requested a limiting instruction. The trial judge instructed the jury that the text messages were not to be considered for their substance, but only to show C.H.'s state of mind.

On cross-examination, C.H. acknowledged that she had testified she only had a glass of sangria and a sip of tequila, but her text messages stated she was getting drunk. C.H. also acknowledged her text messages contained many typographical errors, but stated that she was holding the telephone at her side to conceal her activity from Lewis. C.H. admitted that she never told her friends to telephone the police. C[.]H. also identified the jeans she wore that evening. When defense counsel noted that a tablet of Vicodin was found in her jeans pocket, C.H. denied having taken pharmaceutical drugs that evening. C.H. testified that she once had a prescription for Vicodin to treat migraine headaches.

Amanda Richardson testified that she had two charges of retail theft pending against her in the circuit court of Cook County, which would be dismissed once she

completed a rehabilitation program for addiction to anti-anxiety medication. The addiction developed after the incident at issue in this case. Amanda denied that the State had promised her anything for her testimony in this case.

Amanda stated that she had gone home to Michigan for the July 4th holiday in 2009, but she was returning to Chicago with a friend on July 5, 2009. Amanda testified that she received text messages from C.H. during the trip. Amanda had a drink at 2 p.m., but did not feel drunk by the time she was dropped off at her building at approximately 11 p.m. Amanda telephoned C.H. when she arrived at the building, but there was no answer.

When Amanda reached their apartment, she was surprised to find the door handle locked, as normally only the deadbolt was locked. Amanda opened the door and found C.H. sitting on a futon in the living room. C.H. ran up to her, but she did not immediately try to leave or say there was a rapist in the apartment. Amanda testified that she also saw Lewis in the apartment.

C.H. seemed to be in a panic and asked Amanda whether she wanted to leave right away. Amanda replied that she wanted to remove her contact lenses, which were bothering her. C.H. told Amanda to hurry, because they needed to go downstairs. After removing her contact lenses, Amanda noticed that the apartment was very messy, with the futons and dining room table out of place, a coffee table overturned, and sangria spilled on the floor. Amanda testified that she also noticed Lewis's underwear on a futon, but she later stated that she did not ask whose underwear it was.

Amanda also testified about the conversation in the elevator, adding that Lewis was slurring his words and seemed slightly off-balance. C.H. was crying and shaking in the elevator and 'sort of bolted out' when the doors opened on the first floor. C.H. sprinted down the block, saying, 'is he behind us, is he following us, make sure he is not following us.' Once Amanda caught up, she tried putting her arm around C.H., who resisted and turned away. Amanda asked C.H. whether Lewis had done anything to her. C.H. kept saying, 'I told him it wasn't okay.' Amanda ultimately asked C.H. whether Lewis had raped her, at which point C.H. collapsed and wailed, with her body shaking. Amanda noticed that C.H.'s left eye was tender-looking and puffy. Amanda further testified that the women telephoned their mothers and the police, then returned to their building to meet with the police.

Chicago police officer Geoffrey Roberts testified that on July 5, 2009, he received a radio call at approximately 11:30 p.m. regarding a sexual assault at 833 West Buena Street. When he arrived, Officers Eric Leal and Lisa Echeverri were already on the scene. Officer Roberts met with Amanda and C.H., who appeared distraught, fidgety and nervous. After speaking to Johnny Diamond, the building's security guard, Officer Roberts and other police went up to Lewis's apartment, but there was no answer.

Johnny Diamond testified that on the night at issue, he saw two women who were new residents run out of the building. One of the women seemed upset, but Johnny was unable to catch up to ask what was wrong. Lewis then approached him, which Johnny found unusual, because Lewis normally got off work at 4 a.m. Johnny thought Lewis seemed a little intoxicated. According to Johnny, Lewis went upstairs after a few minutes.

Officer Leal testified that when the police went back to Lewis's apartment a second time, Lewis's wife answered and Lewis later appeared behind her. After verifying Lewis's identity, the police took him into custody and transported him to the police station.

Evidence technician Ted Delis testified that he collected evidence from C.H.'s apartment, including a blanket in her bedroom, a cigarette butt, and a pair of men's underwear from the living room. The parties stipulated that forensic scientist Michelle Bybe would testify that she analyzed the vaginal swabs taken from C.H. and found no semen on the swabs. Bybe would also testify that it was possible for there to be penile-vaginal contact without the test detecting semen. The parties also stipulated that forensic scientist Angela Kaeshamer would testify that she analyzed a pink and white blanket, and that Lewis's DNA profile was not found on the blanket.

At the conclusion of the State's case, defense counsel moved for a directed finding on the charge alleging contact between Lewis's mouth and C.H.'s vagina. The trial judge granted the motion. The trial judge also admonished Lewis about his right to testify. Lewis confirmed he did not wish to testify on his own behalf.

Dr. Virginia Valadka, who examined C.H. at Thorek Hospital on July 5, 2009, testified as a witness for the defense. Dr. Valadka testified that her examination of C.H.'s ears, neck, mouth, throat and genitals did not show abnormalities. Dr. Valadka found superficial abrasions on C.H.'s breasts and wrists, but no ligature marks on her neck (and C.H. did not mention being choked with her scarf). Dr. Valadka did not see any bruising on C.H.'s face, but noted that bruises may take hours to appear after someone is struck. Similarly, C.H.'s vagina and cervix did not show tearing or bruising, but the absence of tearing or bruising did not mean that no sexual assault occurred.

Dr. Valadka further testified that C.H. denied that Lewis penetrated her vagina with his fingers. C.H. initially told Dr. Valadka that Lewis had not used a condom, but C.H. later said that she was unsure on that point. According to Dr. Valadka, C.H. had told the nurse she was taking birth control and Lorazepam, a mild tranquilizer. Dr. Valadka stated that C.H. appeared anxious and fearful. Dr. Valadka opined that, based on her experience, C.H.'s presentation could be deemed consistent or inconsistent with someone who was a victim of sexual assault.

During closing arguments, defense counsel argued that after drinking with C.H. and disrobing in her living room, Lewis went with C.H. into the bedroom and passed out on the bed. Defense counsel argued that the lack of physical and forensic evidence supported the defense that no intercourse occurred. Following jury instructions, the jury deliberated and found Lewis guilty of aggravated criminal sexual assault based on contact between his penis and C.H.'s vagina, but acquitted Lewis on the count of aggravated criminal sexual assault based on contact between Lewis's finger and C.H.'s vagina.

Defense counsel filed a posttrial motion for a new trial. On August 12, 2010, after the trial judge denied the posttrial motion, Lewis requested to proceed *pro se*. After admonishing Lewis pursuant to Illinois Supreme Court Rule 401 (eff. July 1, 1984), the trial judge granted Lewis's request, granted defense counsel leave to withdraw, and

continued the case. Over the course of several status dates, the State tendered discovery to Lewis.

On October 1, 2010, Lewis filed his *pro se* motion for a new trial, claiming that the trial court erred in overruling defense objections to inadmissible evidence and prejudicial argument while sustaining the State's objections to admissible evidence. Lewis also claimed that he received ineffective assistance from his private trial counsel. Lewis alleged that trial counsel: (1) interfered with his right to testify; (2) failed to investigate and call his neighbors as witnesses; (3) failed to call character witnesses; and (4) entered into a stipulation regarding the transferability of chlamydia instead of calling a forensic scientist to testify about the subject.

On the hearing date for his *pro se* motion, Lewis also filed a motion for the appointment of a public defender to represent him at the hearing. The trial judge appointed an assistant public defender, who demurred on the ground that he did not know the case and was unprepared to proceed. The trial judge then informed Lewis that his motion was dilatory and that Lewis would have to present his motion himself. Marvin Bloom, Lewis's former private counsel, was present in court, but Lewis waived the right to call witnesses or present argument.

The State called Bloom to testify regarding his representation of Lewis. Bloom testified that he did not believe Lewis had given him any names of witnesses and that his investigator was working with descriptions of Lewis's neighbors. Bloom also testified that he discussed testifying with Lewis, who chose not to testify. Bloom explained that when questioned by police, Lewis had told them he had consensual sexual intercourse with C.H. Proceeding on a trial theory that no intercourse occurred, Bloom explained that he would not call Lewis as a witness due to the available impeachment by the prior statement to police. Bloom further testified that he did not call character witnesses because Lewis did not testify.

The trial court denied Lewis's *pro se* motion and proceeded to a sentencing hearing. After hearing evidence in aggravation and mitigation, the trial judge sentenced Lewis to 15 years in prison." *People v. Lewis*, 2012 IL App (1st) 103576-U, ¶¶ 7-42.

¶ 5 On direct appeal, defendant challenged, among other things, the trial court's decision to exclude the results of C.H.'s positive test for chlamydia under the Illinois rape shield statute (725 ILCS 5/115-7 (West 2014)) because the evidence was necessary to support his trial defense that he had not had sex with C.H. A different panel of this court noted that defendant had not provided an offer of proof about what the excluded evidence would have been, and that there was no expert evidence regarding the incubation period or transmission of the disease. *Lewis*, 2012 IL App (1st) 103576-U, ¶¶ 54-55. It also noted that defendant asserted that he had tested negative but provided no actual evidence showing that he never had the disease. *Id.* ¶ 55. The appellate court stated, "Given the absence of evidence that [defendant]'s test would have produced a relevant result, we cannot conclude that the trial court erred in barring evidence of C.H.'s positive test." *Id.*

¶ 6 On September 29, 2014, defendant filed a *pro se* postconviction petition, alleging ineffective assistance of counsel. Specifically, defendant contended that appellate counsel was ineffective for failing to argue on direct appeal that trial counsel was ineffective for (1) "failing to introduce evidence that defendant tested negative for Chlamydia, and *** for *** fail[ing] to make an offer of proof concerning who administered the Chlamydia test and the

documentation of the test results," (2) failing to obtain DNA evidence from the pair of men's underwear that was found in the victim's apartment, (3) entering into a stipulation describing testimony of two forensic scientists instead of calling them to testify in person, and (4) failing to challenge several aspects of the probable cause determination.

¶ 7 Specifically, in regards to his first claim of ineffective assistance, defendant contended that C.H. had tested positive for chlamydia when she was taken to the hospital after the incident. Defendant further contended that upon entering the Cook County jail, he was tested on "at least" three separate occasions for "DNA, Sexual[ly] Transmitted Disease, etc." using "Mouth Swabs and Blood Testing." Defendant told his trial counsel that he "had negative results for all sexually transmit[ted] disease[s]." Defendant contended that his trial counsel "should have conducted a proper investigation, found who administer[ed] the test, and call[ed] him into [*sic*] testify" or "introduce[d] into evidence the documentation of the test results during the State[']s] Motion 'In Limine'." Defendant further contended that counsel should have "introduced into evidence the incubation period of chlamydia, the likehood [*sic*] of him contracting the disease, the symptom[s] of the ailment, and the transmission of the disease." Defendant stated that his "theory at trial was that he didn't have forcible or consensual sexual intercourse with C.H." He argued that "[t]his theory would have been supported by evidence that he did not contract Chlamydia from C.H." and that such evidence would have "further discredited C.H. in the eyes of the Jury." Defendant thus argued that "Trial Counsel was ineffective for his failure to properly challenge the aforementioned motion and Appellate Counsel was ineffective for failing to point out trial counsel's ineffectiveness on Direct Appeal."

¶ 8 On November 7, 2014, the trial court entered a written order finding all issues in defendant's petition to be "frivolous and patently without merit." Regarding defendant's ineffective assistance issue based on his negative chlamydia test results, the court found that the underlying issue "lacks any conceivable merit." The court noted that it had previously found that the victim's positive test result was inadmissible pursuant to the Illinois rape shield statute, and without evidence that the victim had tested positive for chlamydia, evidence of defendant's negative test result was "meaningless." The court further opined on the strength of the trial evidence against defendant, and found that even if the underlying issue were meritorious, defendant was unable to establish prejudice based on counsel's allegedly ineffective assistance.

¶ 9 Although defendant raised a number of issues in his *pro se* postconviction petition, defendant has abandoned most of those claims in this court. Defense counsel specifically acknowledges that the second, third, and fourth issues raised in defendant's petition (namely, regarding counsel's failure to obtain DNA evidence from the underwear found in C.H.'s apartment, to call two forensic scientists to testify in person rather than stipulating to their testimony, and to challenge several aspects of the probable cause determination) do not present arguable bases for relief because the record "positively rebuts any showing of prejudice based on the alleged failures of counsel." Moreover, in his *pro se* petition, defendant raised claims of ineffective assistance of both trial and appellate counsel based on the failure of trial counsel to investigate and present evidence of his negative chlamydia test results and the failure of appellate counsel to raise an issue as to trial counsel's effectiveness in his direct appeal. However, in this court, defendant focuses solely on trial counsel's effectiveness, specifically contending that the trial court erred when it summarily dismissed his petition because he made an arguable claim of ineffective assistance of trial counsel based on the failure of trial counsel

to investigate and present evidence of his negative chlamydia test results. By focusing his appeal on trial counsel's effectiveness based on his negative chlamydia test results, defendant has abandoned the remaining claims in his postconviction petition, forfeiting them for review. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016); *People v. Guest*, 166 Ill. 2d 381, 414 (1995).

¶ 10    The State further contends that *res judicata* precludes consideration of defendant's ineffective assistance claim because, in defendant's direct appeal, this court rejected defendant's challenge to his conviction based on the trial court's exclusion of evidence of C.H.'s positive chlamydia test. The State thus contends that defendant is raising the same issue, "albeit in different terms" as the one that was "actually raised" in his direct appeal. The State asserts that defendant "is not entitled to relief under the Act by merely 'rephrasing previously addressed issues in constitutional terms.' "

¶ 11    The doctrine of *res judicata* bars consideration of issues that were previously raised and decided on direct appeal. *People v. Blair*, 215 Ill. 2d 427, 443 (2005) (citing *People v. West*, 187 Ill. 2d 418, 425 (1999)). In this case, on direct appeal, defendant challenged the trial court's decision to exclude evidence of C.H.'s positive chlamydia test results, whereas here, defendant is challenging the effectiveness of counsel for failing to investigate and provide evidence to the trial court of his negative test results, so that the court's decision could have been different. Because the issue that defendant now raises is distinct from the one that was before the appellate court on direct appeal, we do not find *res judicata* to bar defendant's claim.

¶ 12    Nevertheless, we conclude that defendant's claim must fail because defendant did not present an arguable claim that he was denied the effective assistance of counsel. Defendant's specific claim is that his trial counsel provided ineffective assistance by failing to investigate his negative chlamydia test results and to present that evidence to the trial court during the State's motion *in limine* in support of defendant's contention that C.H.'s positive chlamydia test results should have been admitted.

¶ 13    The Act provides a means for a criminal defendant to challenge his conviction or sentence based on a substantial violation of constitutional rights. *People v. Beaman*, 229 Ill. 2d 56, 71 (2008) (citing *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005), and 725 ILCS 5/122-1 *et seq.* (West 2000)). At the first stage of postconviction proceedings, the circuit court must, within 90 days of the petition's filing, independently review the petition, taking the allegations as true, and determine whether the petition is frivolous or patently without merit. *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009); 725 ILCS 5/122-2.1(a)(2) (West 2014). A petition may be summarily dismissed as "frivolous or patently without merit only if the petition has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 11-12; 735 ILCS 5/22-105(b) (West 2014). A claim has no arguable basis when it is based on an indisputably meritless legal theory, such as one completely contradicted by the record, or a fanciful factual allegation, such as one that is fantastic or delusional. *Hodges*, 234 Ill. 2d at 16.

¶ 14    In the review of a first-stage postconviction petition, well-pled factual allegations in a petition and its supporting evidence must be taken as true unless they are positively rebutted by the record, but nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient. *People v. Sanders*, 2016 IL 118123, ¶ 48; *People v. Barnslater*, 373 Ill. App. 3d 512, 519 (2007) (citing *People v. Rissley*, 206 Ill. 2d 403, 412 (2003)). Although defendant need only set forth the "gist" of a constitutional claim at this stage and need not set forth the claim in its entirety (*People v. Edwards*, 197 Ill. 2d 239, 244 (2001)), section 122-2 of the Act

requires that the petitioner clearly set forth the respects in which his constitutional rights were violated and attach affidavits, records, or other evidence supporting the allegations or an explanation for their absence (725 ILCS 5/122-2 (West 2014); *Hodges*, 234 Ill. 2d at 10). We review the summary dismissal of a postconviction petition *de novo*. *People v. Coleman*, 183 Ill. 2d 366, 388 (1998).

¶ 15     An allegation of a violation of the constitutional right to effective assistance of counsel is evaluated under the standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted in Illinois by *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). Under *Strickland*, a defendant raising a claim of ineffective counsel must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Hodges*, 234 Ill. 2d at 17. A failure to satisfy either prong of the *Strickland* standard causes the allegation of ineffective assistance of counsel to fail. See *Strickland*, 466 U.S. at 697.

¶ 16     At the first stage of postconviction proceedings, a defendant need not carry the ultimate burden of showing ineffective assistance of counsel, and "a petition alleging ineffective assistance may not be summarily dismissed if (i) it is *arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) it is *arguable* that the defendant was prejudiced." (Emphases added.) *Hodges*, 234 Ill. 2d at 17. Broad conclusory allegations of ineffective assistance of counsel are not sufficient to avoid a summary dismissal. *People v. Delton*, 227 Ill. 2d 247, 258 (2008).

¶ 17     In this appeal, defendant asserts he made an arguable constitutional claim of ineffective assistance of counsel based on counsel's failure to investigate his negative chlamydia test results, and to present that evidence to the trial court in support of his contention that the victim's positive chlamydia test results should have been admitted. The State responds that the court properly dismissed defendant's petition because it has no arguable basis in fact or in law. The State contends that counsel cannot be ineffective for "failing to raise a meritless claim" and defendant "was not arguably prejudiced" by counsel's decision not to present such a claim.

¶ 18     Counsel's decision " 'not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.' " *Guest*, 166 Ill. 2d at 400 (quoting *Strickland*, 466 U.S. at 691). "Whether the failure to investigate constitutes ineffective assistance of counsel is determined by the value of the evidence not presented at trial and the closeness of the evidence that was presented at trial." *People v. Harmon*, 2013 IL App (2d) 120439, ¶ 26.

¶ 19     At defendant's trial, the court determined that evidence of the victim's positive chlamydia test results was barred under the Illinois rape shield statute, which "absolutely bars evidence of the alleged victim's prior sexual activity or reputation, subject to two exceptions: (1) evidence of past sexual activities with the accused, offered as evidence of consent; and (2) where the admission of such evidence is constitutionally required." *People v. Santos*, 211 Ill. 2d 395, 401-02 (2004). Because the proposed evidence does not concern prior sexual activities between C.H. and defendant, only the second exception is potentially relevant here.

¶ 20     The policy underlying the rape shield statute is to prevent the defendant from harassing and humiliating the complaining witness with evidence of either her reputation for chastity or unchastity, or specific acts of sexual conduct with persons other than defendant, since such evidence has no bearing on whether she consented to sexual relations with the defendant. *Id.* at 414 (McMorrow, C.J., dissenting) (citing *People v. Ellison*, 123 Ill. App. 3d 615, 626 (1984)).

The exclusion of such evidence also " 'keeps the jury's attention focused only on issues relevant to the controversy at hand' " and " 'promotes effective law enforcement because victims can report crimes of rape and deviate sexual assault without fear of having the intimate details of their past sexual activity brought before the public.' " *Id.* (quoting *Ellison*, 123 Ill. App. 3d at 626).

¶ 21     The constitution, however, sometimes requires that a defendant "be permitted to offer certain evidence which was *directly* relevant to matters at issue in the case, notwithstanding that it concerned the victim's prior sexual activity." (Emphasis in original.) *Id.* at 405-06 (majority opinion). The due process clause of the fourteenth amendment (U.S. Const., amend. XIV) and the confrontation clauses of the United States and Illinois Constitutions (U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8) guarantee criminal defendants "a meaningful opportunity to present a complete defense." (Internal quotation marks omitted.) *Santos*, 211 Ill. 2d at 412 (McMorrow, C.J., dissenting). " '[A]n essential component of procedural fairness is an opportunity to be heard.' " *People v. Maxwell*, 2011 IL App (4th) 100434, ¶ 75 (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). Fairness, however, does not require the admission of evidence which is only "marginally relevant" or which "poses an undue risk of harassment, prejudice, [or] confusion of the issues." (Internal quotation marks omitted.) *Id.* ¶ 76 (quoting *Crane*, 476 U.S. at 689-90). "The true question is always one of relevancy [citation], and [t]he alleged victim's sexual history is not constitutionally required to be admitted unless it would make a meaningful contribution to the fact-finding enterprise." (Internal quotation marks omitted.) *People v. Johnson*, 2014 IL App (2d) 121004, ¶ 42; see also *Maxwell*, 2011 IL App (4th) 100434, ¶ 76; *People v. Sanders*, 2015 IL App (4th) 130881, ¶ 47 ("not even the confrontation clause requires the admission of evidence which poses an undue risk of harassment, prejudice, or confusion of the issues. *** Defendant's right of confrontation *** does not extend to matters which are irrelevant and have little or no probative value. Complainant's past sexual conduct has no bearing on whether she has consented to sexual relations with defendant." (Internal quotation marks omitted.)).

¶ 22     Our review of the record of the proceedings on the State's motion *in limine* shows that the trial court initially indicated that it would grant the State's motion to exclude such evidence, and defense counsel presented argument on that issue in an attempt to persuade the trial court to change that decision. Counsel informed the court that defendant "was tested for chlamydia" and "never had chlamydia, never got chlamydia." Defense counsel further argued that the fact that the victim tested positive for chlamydia and defendant did not was "direct medical evidence that *** they did not have sexual intercourse." Counsel contended that "this takes it out of the rape shield example and puts it into the elemental right of the Defendant to present a defense on one of the critical issues in the case which is whether or not there was sex between these parties."

¶ 23     In light of the above exchange, the record appears to rebut defendant's claim that trial counsel failed to investigate defendant's negative test results. Indeed, counsel brought up defendant's test results to the court, stating that defendant "never had chlamydia, never got chlamydia, and has been in jail and was tested for it even on his entry into the jail." The record shows that the court was well aware of C.H. and defendant's respective test results, and the relevance that defendant ascribed to those results.

¶ 24     Nonetheless, even if we were to assume that counsel failed to investigate defendant's test results and, as a result, failed to present the evidence of such investigation to the trial court,

such failure would not constitute deficient performance by defense counsel. Our review makes clear that the trial court did not exclude the test results because counsel did not make an adequate offer of proof or because the court did not believe that evidence of defendant's negative results existed. Instead, the court considered the relevance of the test results and determined that their probative value did not outweigh the interests protected under the rape shield law. The trial court's conclusion on this issue is in line with the great weight of authority from our jurisdiction and others regarding the introduction of evidence of a sexually transmitted disease under various rape shield statutes. See *State v. Knox*, 536 N.W.2d 735, 738-39, 743 (Iowa 1995) (trial court did not abuse its discretion in refusing to admit proffered evidence that victim tested positive for chlamydia while the defendant did not when the probative value of the proffered evidence was "very weak" and the evidence did "not reach a level of probative force to warrant the inflammatory and prejudicial impacts upon the victim and the proceeding by its admission" (internal quotation marks omitted)); *State v. Ozuna*, 316 P.3d 109, 114 (Idaho Ct. App. 2013) (evidence related to the victim's STD and the defendant's lack of the STD was properly excluded and the exclusion did not violate the defendant's constitutional right to present a defense); *State v. Mitchell*, 568 N.W.2d 493, 496 (Iowa 1997) (the trial court did not violate the defendant's constitutional right to confront witnesses by excluding evidence showing that he did not contract a particular strain of gonorrhea that the victim had, and that there was a 20 to 30% chance that the defendant would have contracted it after sexual contact; such evidence was not relevant, and the prejudicial effect of the evidence outweighed its probative value).

¶ 25     We also note that, although defendant has presented no evidence regarding the transmission rate of chlamydia, other courts have examined such evidence, which generally tends to show that a male has an approximately 30% chance of contracting chlamydia from an infected female during a single act of intercourse. See *Knox*, 536 N.W.2d at 738. Moreover, if a condom is used during the sexual act, the transmission rate drops to virtually "nil." *Id.* at 739. In this case, C.H. testified that she did not know whether defendant had used a condom during the incident, or whether he had ejaculated. Dr. Valadka testified that C.H. initially told her that defendant had not used a condom, but said later that she was not sure whether he had. There was no semen found on the vaginal swabs taken from C.H. This evidence suggests that defendant may have used a condom during the incident, making the potential rate of transmission from C.H. to defendant somewhere between 0 and 30%. *Id.* at 738-39; see also *State v. Ervin*, 723 S.W.2d 412, 415 (Mo. Ct. App. 1986) (suppression of evidence that victim had gonorrhea and defendant did not upheld where (1) there was less than a 33⅓% chance defendant would have contracted the disease during unprotected sexual intercourse with the victim and (2) evidence would have had prejudicial effect).

¶ 26     In light of the above, we find no arguable claim that defense counsel performed deficiently by failing to investigate and present evidence of defendant's negative chlamydia test results. See *People v. Edwards*, 195 Ill. 2d 142, 165 (2001) (holding that defense counsel is not ineffective for failing to make a fruitless argument).

¶ 27     For many of the same reasons, we also conclude that defendant has not made an arguable claim of prejudice based on counsel's allegedly deficient performance. Had counsel made an offer of proof or introduced the specific evidence of defendant's results, which defendant now claims should have been introduced, it is not arguable the trial court would have ruled differently.

¶ 28    Many courts outside this jurisdiction have addressed, and rejected, similar issues as the one defendant raises in this appeal, finding that a defendant cannot establish a reasonable probability that he was prejudiced based on counsel's failure to raise the kind of evidence proffered here. See *Evicci v. Maloney*, 387 F.3d 37, 42 (1st Cir. 2004) (the petitioner's claim that defense counsel was ineffective for failing to raise a defense based on the fact that petitioner did not contract chlamydia from the victim after the alleged rape did not establish a reasonable probability that the result of the trial would have been different to warrant *habeas* relief in light of "the speculative quality of the assumed medical evidence and the substantial evidence of guilt presented by the government"); *Anderson v. Commissioner of Correction*, 98 A.3d 23, 25 (Conn. 2014) (finding that the petitioner had not raised a reasonable probability of prejudice from alleged ineffective assistance based on "trial counsel's failure to investigate his claims that he had a history of various sexually transmitted diseases, to introduce medical records concerning that history, to introduce evidence concerning whether the victim had contracted any sexually transmitted diseases, and to present expert testimony concerning the transmission rates of such diseases").

¶ 29    In light of the strong evidence of defendant's guilt presented at trial, we do not find it arguable that the results of defendant's trial would have been different had the test results been entered into evidence. C.H. testified extensively regarding the events leading up to the incident and defendant's various advances. C.H. also testified to her repeated rejections of those advances and defendant's increasingly forceful and violent actions. As the appellate court on direct appeal noted, C.H.'s testimony was substantially corroborated by her roommate Amanda's "testimony of C.H.'s distraught condition and prompt outcry, as well as her observation of the condition of their apartment, with furniture displaced and what she believed was Lewis's underwear on a futon in the living room." *Lewis*, 2012 IL App (1st) 103576-U, ¶ 50. C.H.'s account was also corroborated by "[t]estimony from the police, building security guard and Dr. Valadka" who testified regarding "C.H.'s agitation after the incident." *Id.* The evidence also showed abrasions to C.H.'s breasts and wrists and a bruise that developed under C.H.'s left eye, which was consistent with her testimony that defendant had struck her in that location. *Id.* C.H.'s testimony was further corroborated by the text messages she sent to friends that night, which showed her growing sense of alarm throughout the evening. In these circumstances, we find no arguable prejudice based on counsel's failure to investigate and present evidence of defendant's negative test results.

¶ 30    Because we find that defendant failed to present the gist of a constitutional claim, we need not reach the State's alternative argument that summary dismissal was appropriate where defendant failed to attach medical records or other documents supporting his claimed test results.

¶ 31    Accordingly, we affirm the circuit court's order dismissing defendant's petition at the first stage of proceedings.

¶ 32    Affirmed.