2021 IL App (1st) 190705-U

No. 1-19-0705

Order filed February 26, 2021

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 15690 |
| | ) | |
| JERMALLE BROWN, | ) | Honorable |
| | ) | Thaddeus L. Wilson, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Justices Cunningham and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The summary dismissal of defendant's *pro se* postconviction petition is affirmed over his contention that he stated the gist of a claim that his trial counsel was ineffective for failing to strike a potentially biased juror.

¶ 2    Defendant Jermalle Brown appeals from the summary dismissal of his *pro se* petition for relief filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). On appeal, defendant contends that his petition stated the gist of a claim that his trial counsel was ineffective for failing to strike a seated juror, A.J., who indicated during *voir dire* that

he had potential bias in favor of law enforcement and had family and friends who had been victims of similar offenses. For the reasons that follow, we affirm.

¶ 3    Following a 2015 jury trial, defendant was convicted, under a theory of accountability, of one count of first degree murder (720 ILCS 5/9-1(a)(3) (West 2012)) and one count of home invasion (720 ILCS 5/12-11(a)(3) (West 2010) (renumbered as 720 ILCS 19-6 by Pub. Act 97-1108, § 10-5 (eff. Jan. 1, 2013)). The trial court merged the counts and sentenced defendant to 30 years in prison for first degree murder. We affirmed on direct appeal. *People v. Brown*, 2018 IL App (1st) 151377-U. Although we set forth the underlying facts of the case in that order, we repeat them here due to the nature of the issue in this appeal.

¶ 4    During *voir dire*, the trial court admonished a panel of 28 potential jurors. When the court asked the venire if there was anything about the general subjects of murder and home invasion that would prevent anyone from being a fair and impartial juror, three potential jurors, including A.J., stated their names. A.J. and two other potential jurors also indicated they were familiar with the area of East 73rd Street and Stoney Island Avenue where the offenses occurred.

¶ 5    When the court questioned A.J. individually, he stated he was an insurance agent and a pastor. He was married with three children, the youngest of whom was a Chicago police officer assigned to a gang unit. In response to the court's question whether there was anything about that relationship that would prevent him from being a fair and impartial juror, A.J. answered, "I couldn't—maybe look at things one way. *** It could make me look at things one way because I know what he goes through every day out there. I hear him and his friends and I just know what they go through every day out there." The court then asked if A.J. could put aside "whatever you hear" and decide the case on the facts and the law. A.J. answered, "I would have to look at the case

as it goes." When the court asked A.J. again whether he could follow the law based on the facts of this case, A.J. answered, "Okay. Yes." A.J. also told the court that he would not have difficulty giving the testimony of police officers the same weight as witnesses who were not in law enforcement.

¶ 6    A.J. also told the court he had previously served on a jury in an attempted murder trial and that there was nothing about that jury experience that would prevent him from being a fair and impartial juror in this case. When asked whether any family or close friends had ever been a victim of a crime, A.J. said his brother was shot and killed 30 years ago, his friend was killed in a home invasion about 20 years ago, and the friend's wife was wounded in the same incident. A.J. indicated that there was nothing about those experiences that would prevent him from being a fair and impartial juror.

¶ 7    A.J. informed the court that he had never been a member of a street gang, but he knew that people who lived around his church had been in gangs. He stated that nothing about those relationships would prevent him from being a fair and impartial juror, and that he would not automatically reject or disbelieve a gang member's testimony. A.J. had participated in anti-gang / educational programs, including "Stop the Violence," "Say No to Drugs," "West Englewood Associations," and "Englewood Aggression Association." He stated that he believed individuals affiliated with street gangs are likely to engage in criminal conduct.

¶ 8    A.J. confirmed that he could not think of any reason he could not be a fair and impartial juror in this case and could not think of anything that might disqualify him from serving on the jury. The court then asked A.J. whether he raised his hand earlier "regarding the subject and the area." A.J. answered, "Yes, it's a sore subject because a friend of mine, his wife was killed in a

home invasion. The area, I have a grandson and his mother live in the area." The court asked A.J. whether he could put aside whatever happened with people he knew, listen to the evidence in this case, and decide this case based on the evidence and the law. A.J. answered, "Yeah, I can do that."

¶ 9   The matter proceeded to jury selection in chambers. The State moved to excuse four potential jurors for cause, and defense counsel moved to excuse two. The court struck all six. The State exercised six peremptory challenges and defense counsel exercised four. A.J. was one of the first panel of 13 jurors seated on the jury. The court then conducted additional *voir dire* to select a second alternate juror. One potential juror was stricken for cause. Defense counsel exercised two peremptory challenges, and the State exercised three. A second alternate juror was seated.

¶ 10   At trial, Dondra Sharkey testified that, in July 2012, he lived in an apartment building owned by his grandparents located on East 73rd Street. At that time, two rival factions of the Gangster Disciples street gang—Little Paris City (LPC) and Siricon Mafia—were engaged in an ongoing "war." Sharkey testified that Stony Island Avenue was the boundary between the factions' territories and that the LPC faction controlled the area east of Stony Island while the Siricon Mafia controlled the area west of Stony Island. The building that Sharkey lived in was located a block west of Stony Island. Sharkey testified that, although he was not a member of the Siricon Mafia, he would regularly "hang out" with members of the gang in his apartment. He did not cross Stony Island for fear of being shot, "jumped on," or kidnapped.

¶ 11   On July 25, 2012, Sharkey propped open the doors to his building, his apartment, and his bedroom because it was hot and he did not have air conditioning. Around 9:45 p.m., he was sitting in his room watching television when he looked up and saw a person, whom he identified in court as defendant, standing a foot away from him. Defendant did not have his face covered, but he had

a blue t-shirt around his neck and was holding the ends of the t-shirt with his hands. Sharkey recognized defendant from the neighborhood and thought his "street name" was "J Money." Defendant told Sharkey to stand up.

¶ 12    A second person, later determined to be 16-year-old Douglas Bufford, entered the room with a revolver in his hand, a red hat on his head, and a white t-shirt tied around his face. Bufford told Sharkey to stand up, but Sharkey froze. A third person, later identified as Dominique Harris, appeared in the doorway with nothing covering his face, a hair style of short dreadlocks, and a shotgun in his hands.[1] Sharkey testified that he could see a fourth person, later identified as Lance Whitfield, looking into the room from the hallway. Dominique told Sharkey to get up and stand by the refrigerator. As Sharkey stood up and began walking toward the kitchen, the shotgun discharged. Bufford was struck in the head and fell backwards onto the floor. Sharkey ran to his grandparents' apartment across the hall. As he banged on his grandparents' door, he saw people run out of his apartment. Sharkey followed them to the building's front door. From the doorway, he saw Dominique run toward Stony Island and defendant run the other way, "toward the viaduct."

¶ 13    When police arrived on the scene, Sharkey told an officer that LPC members were standing on the opposite side of South Blackstone Avenue. Police detained the individuals standing on the corner of 73rd and Blackstone and brought them to the apartment building for a show-up. Sharkey identified four people, including defendant, as the men who had entered his apartment. In the days following the incident, Sharkey told the police that he "wasn't sure about" all the identifications that he had made, but was sure about his identification of defendant.

---

[1] Because Dominique Harris and Tyri Harris, who testified for the defense, are brothers who share a last name, we will refer to them by their first names.

¶ 14    Chicago police officer Timothy Finley testified that he responded to a call of shots fired. When he arrived at the apartment, he found the door propped open and Bufford lying on the floor, unconscious, with a shirt tied around his face and a revolver by his hand. Finley found one spent shotgun shell casing on a nearby couch and noted blood, brain matter, and holes from what appeared to be a shotgun blast on the wall and ceiling.

¶ 15    Chicago police officer Dawn Hubbard testified that she spoke with Sharkey when she responded to the scene. She moved him from the apartment to the building's vestibule in order to get out of the way of the paramedics who were attending to Bufford. While they were in the vestibule, Sharkey pointed across the street and told her "those were the guys that [were] in his apartment." Other officers detained the individuals and a show-up was conducted. During the show-up, Sharkey identified defendant as the individual who entered his apartment first and told him to get up, Dominique as the individual with the shotgun, Whitfield as one of the individuals who entered his apartment, and James Sims as another individual "that was there at the time of the incident."

¶ 16    A forensic investigator testified that he fingerprinted Bufford while he was in critical condition at Stroger Hospital in order to ascertain his identity. A detective testified that on July 29, 2012, Bufford was removed from life support and died. The medical examiner who performed Bufford's autopsy testified that he died as a result of a shotgun wound to the head and that the manner of death was homicide.

¶ 17    Scott Rochowicz, a forensic scientist who was deemed an expert in the field of microscopy and trace chemistry, testified that a gunshot residue test performed on defendant's hands about 3 hours and 45 minutes after the shooting was negative. He explained that a person may get gunshot

residue on their hands from being in close proximity to a firearm when it is discharged. Rochowicz further stated that gunshot residue is easy to remove, for example, by rubbing one's hands together, running one's hands across pants pockets, washing one's hands, or sweating. According to Rochowicz, gunshot residue tests are best administered within two hours of an incident because most gunshot reside is naturally removed within that time frame. Finally, he agreed that a negative gunshot residue test does not mean a person was not in a room where a weapon was discharged.

¶ 18    Defendant was arrested on July 25, 2012, and held in custody for about 48 hours, during which he was interviewed multiple times by multiple detectives. The State admitted into evidence several video recordings of defendant speaking with police detectives inside an interview room that was equipped with audio and video recording devices. During an interview with Chicago police detectives John Halloran and Tom Vovos, defendant told the detectives that, on the date in question, he was in a park playing basketball and smoking marijuana. Bufford, who was drunk, arrived at the park and told defendant that he was going to shoot a member of the Siricon Mafia. Defendant attempted to dissuade Bufford, but eventually followed Bufford and an individual named Anthony Hull, in order to try to stop them. Defendant said that he entered the building, but did not enter Sharkey's apartment. He also stated that he did not see anyone with a shotgun. After defendant heard a gunshot, he and Hull ran out of the building and back across Stony Island.

¶ 19    During an interview with Chicago police detectives Scott Reiff and Daniel Stanek, defendant told the detectives that his group "[w]as going over there to shoot somebody" or "blast somebody." In a subsequent interview, defendant told detectives that he stood outside the apartment and was "looking around" for rival gang members and police officers so that he could give Bufford "a heads up."

¶ 20    Over defendant's objection, the State admitted into evidence an August 1, 2012, recording of defendant alone in an interrogation room. In the video, defendant is rapping and, at times, it appears that he is making gestures of firing a weapon with his hands. The audio quality of the video makes defendant's words while he is rapping indecipherable. However, at the end of the recording, in a different tone of voice than he was using while rapping, defendant can be heard saying, "Mother f***, I really f***ed up in this b***, yo." During his testimony regarding the contents of the August 1, 2012, video, Chicago police detective John Halloran described defendant's hand gestures as gang signs.

¶ 21    At the close of the State's case-in-chief, defendant made a motion for a mistrial, contending that the August 1, 2012, video of him alone inside the interview room and Halloran's description of his hand gestures as gang signs were prejudicial. The trial court denied defendant's motion, noting that there was "no basis in law or fact or any ruling o[f] the Court for a mistrial." The court also denied defendant's motion for a directed verdict.

¶ 22    For the defense, Tyri Harris testified that, before the shooting, he was playing basketball in a park with defendant, Dominique, Whitfield, and Sims. Bufford, a member of the LPC gang, arrived at the park and told the group that he was going to go into Siricon City territory. The group, including defendant, told Bufford not to go, but Bufford did not listen. Tyri agreed that defendant "tried to talk [Bufford] out of it." Hull arrived at the park and told Bufford he would accompany him. Defendant followed Bufford and Hull, "saying he was going to calm [Bufford] down." Tyri testified that he did not see anyone at the park with a gun. About 10 minutes later, Hull returned to the park and said that "[Bufford] was tweaking." Then defendant returned to the park alone, and the group decided to go across Stony Island to see what had happened to Bufford. As the group

was standing across the street from the scene, Tyri saw the police arrest defendant, Dominique, Whitfield, and Sims.

¶ 23    At the close of evidence, defendant renewed his motion for a mistrial, arguing that Halloran's testimony about gang signs was prejudicial. The trial court denied the motion, reasoning that the defense elicited the testimony and that the statements were not so prejudicial as to deprive defendant of a fair trial.

¶ 24    In closing, the State argued that defendant was accountable for Bufford's death because when he entered Sharkey's apartment, "he set this chain of events into motion." Defense counsel argued that defendant was not involved in the incident, but rather, was trying to be a "peacemaker" by attempting to talk Bufford out of going into rival gang territory. Defense counsel also argued that no physical evidence tied defendant to the offense.

¶ 25    After deliberation, the jury found defendant guilty of home invasion and first degree murder during the commission of a forcible felony. The trial court denied defendant's motion for a new trial, which argued, *inter alia*, that the court erred in allowing the State to publish the August 1, 2012, video. At sentencing, the trial court merged the home invasion count into the first degree murder count and sentenced defendant to 30 years' imprisonment.

¶ 26    On direct appeal, defendant contended that he was denied a fair trial when the trial court allowed the State to publish to the jury the August 1, 2012, video because it had no probative value and only served to prejudice the jury. We rejected defendant's contention, finding that "even assuming, *arguendo*, that the trial court did abuse its discretion in allowing the State to publish the video to the jury, we find that the error would be harmless in light of the overwhelming evidence of the defendant's guilt." *Brown*, 2018 IL App (1st) 151377-U, ¶ 19. We noted that defendant told

detectives he went to the apartment to shoot or "blast somebody" and looked around for rival gang members and police officers so that he could give Bufford a "heads up"; that Sharkey testified defendant was the first man to enter his room; and that Sharkey identified defendant and later told police that he was sure about his identification. *Id.* We concluded, "This evidence, in the context of a conviction for murder predicated on the death that occurred during the commission of a home invasion, is overwhelming." *Id.*

¶ 27    On December 14, 2018, defendant filed the *pro se* postconviction petition at issue in this appeal. In the petition, defendant argued that his trial counsel was ineffective for failing to strike a biased jury member, A.J., and that his appellate counsel was ineffective for failing to raise the issue on direct appeal. To support his claim, defendant attached excerpts from *voir dire* and a transcript of the parties' challenges to the venire.

¶ 28    On March 1, 2019, the circuit court summarily dismissed the petition as frivolous and patently without merit. The court observed that A.J. ultimately said he could be fair, decide the case based on the law and evidence, and put aside what he knew from his police officer son and experiences with a brother and friend who were victims of violent crime. The court noted that A.J.'s other answers showed possible bases why the defense may have wanted him on the jury, including his religious ministry and work with anti-violence programs. The court also found that trial counsel's decisions concerning other peremptory challenges indicated he was engaged in strategic decision-making. Considering A.J.'s entire *voir dire* in context with counsel's decisions in jury selection as a whole, the court found it was not arguable that counsel's decision not to challenge A.J. was unreasonable or anything other than trial strategy. Moreover, the court found that counsel's decision did not arguably prejudice defendant, as there was overwhelming evidence

of his guilt. Finally, the court determined that appellate counsel was not arguably ineffective because the claim would not have been successful on direct appeal.

¶ 29    On appeal, defendant contends that his petition should have survived summary dismissal because he stated the gist of a claim that his trial counsel was ineffective for failing to strike A.J. as a juror.

¶ 30    In cases not involving the death penalty, the Act provides a three-stage process for adjudication. 725 ILCS 5/122-1 (West 2018); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The instant case involves the first stage of the process, during which the trial court independently assesses the petition, taking the allegations as true. *Hodges*, 234 Ill. 2d at 10. Based on this review, the trial court must determine whether the petition "is frivolous or is patently without merit," and, if it so finds, dismiss the petition. 725 ILCS 5/122-2.1(a)(2) (West 2018).

¶ 31    A petition may be dismissed as frivolous or patently without merit "only if the petition has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 16. A petition has no arguable basis in law when it is founded in "an indisputably meritless legal theory," for example, a legal theory that is completely belied by the record. *Id.* A petition has no arguable basis in fact when it is based on a "fanciful factual allegation," which includes allegations that are "fantastic or delusional" or contradicted by the record. *Id.* at 16-17; *People v. Morris*, 236 Ill. 2d 345, 354 (2010). Our review of a first-stage dismissal is *de novo*. *Hodges*, 234 Ill. 2d at 9. Pursuant to this standard, we review the trial court's judgment, not the reasons given for it. *People v. Jones*, 399 Ill. App. 3d 341, 359 (2010).

¶ 32    Traditionally, to establish ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) but for

counsel's errors, there is a reasonable probability that the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). However, our supreme court has indicated that in the context of first-stage postconviction proceedings, a defendant need not conclusively establish these factors; in *Hodges*, our supreme court held that "a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17.

¶ 33 In this court, defendant contends that his petition should not have been summarily dismissed, as he stated the gist of a claim of ineffective assistance of trial counsel where counsel failed to strike A.J. as a juror after A.J. indicated he had potential bias in favor of law enforcement and had family and friends who had been victims of similar offenses. Defendant maintains that A.J.'s statement to the trial court that he was impartial was equivocal, as he also told the court that the subject matter of the case was "a sore subject" for him, that his point of view was influenced by his son's experiences in law enforcement, and that he believed people affiliated with gangs were more likely to engage in criminal conduct. According to defendant's argument, A.J.'s responses, taken in context, indicate he "may not have been as impartial as he had presented himself to be." Defendant argues that trial counsel's strategy regarding which potential jurors to strike was arguably unreasonable and not a matter of record. He further asserts that he was arguably prejudiced because the evidence against him was not overwhelming and there was a better than negligible chance that a juror who was biased in favor of law enforcement and partial to victims of home invasion and murder could have changed the outcome of the case.

¶ 34    As noted by the State in its brief, our supreme court held in *People v. Tate*, 2012 IL 112214, ¶¶ 20-22, that considerations of trial strategy are inappropriate for the first stage of post-conviction proceedings. As such, we will proceed to considerations of prejudice.

¶ 35    After reviewing the record, we find that defendant has not satisfied the prejudice prong of the *Strickland* test, notwithstanding the low standard by which postconviction petitions are judged at the first stage of proceedings. Regardless of A.J.'s presence on the jury, the evidence of defendant's guilt was overwhelming, as we observed in our order on direct appeal. See *Brown*, 2018 IL App (1st) 151377-U, ¶ 19. Defendant told detectives that he and his group went to the apartment to shoot or "blast somebody." He also told detectives that he looked around for rival gang members and police officers so that he could give Bufford a "heads up." Sharkey testified at trial that defendant was the first man to enter his room. On the day of the shooting, Sharkey identified defendant as one of the men who entered his apartment. Later, Sharkey told the police that he was sure about his identification of defendant.

¶ 36    The question before us is whether it is reasonably probable that a jury would have acquitted defendant had counsel excused A.J. from service on the jury. *People v. Dixon*, 409 Ill. App. 3d 915, 923 (2011). In light of the overwhelming evidence of defendant's guilt, we cannot say this is the case. See *id.* at 923-24. As such, defendant has failed to set forth a claim that he was arguably prejudiced by trial counsel's failure to strike A.J. as a juror. *Id.* at 924 (where the defendant's convictions were "driven by the overwhelming evidence," there was no reasonable probability of acquittal had the foreman not been part of the jury, and summary dismissal of petition was proper); see also, *e.g.*, *People v. Carlisle*, 2019 IL App (1st) 162259, ¶ 81 (overwhelming evidence of guilt precluded arguable showing of prejudice); *People v. Lewis*, 2017 IL App (1st) 150070, ¶ 29 (no

arguable prejudice where the evidence of the defendant's guilt was "strong"); *People v. Viramontes*, 2016 IL App (1st) 160984, ¶¶ 53-54 (where evidence of guilt was overwhelming, the defendant could not establish arguable prejudice); *People v. Douglas*, 2011 IL App (1st) 093188, ¶ 36 (no arguable prejudice existed where the incriminating evidence left "no concern that the defendant was wrongly convicted"). Accordingly, we affirm the judgment of the circuit court summarily dismissing defendant's postconviction petition.

¶ 37    In reaching this conclusion, we are mindful of defendant's argument that we should not echo our earlier finding, made on direct appeal, that the evidence of his guilt was overwhelming. He asserts that on direct appeal, we failed to consider key evidence that:  he made a statement that he tried to talk Bufford out of harming a rival gang member; he made conflicting statements over the course of the 48 hours he was in custody for interrogation; a gunshot residue test performed on him was negative, despite Sharkey's testimony that defendant  was the person closest to him when Bufford was shot; and Tyri testified that defendant followed Bufford to talk him out of harming a rival gang member and refused to go with him to do so. Defendant concludes that, when these circumstances are taken into account, the evidence against him was not overwhelming.

¶ 38    We are well aware of the alleged imperfections in the State's case that defendant has identified.  However, we disagree with defendant's conclusion that these imperfections prevent a finding that the evidence of his guilt was overwhelming. Evidence may be deemed overwhelming even in the absence of physical evidence or a confession, or where a defendant questions the credibility of witnesses. See *People v. Weston*, 2011 IL App (1st) 092432, ¶¶ 38, 42; see also *People v. Bost*, 80 Ill. App. 3d 933, 944 (1980) (evidence was overwhelming despite some conflicting testimony). As a result, defendant's argument fails.

¶ 39    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 40    Affirmed.