2020 IL App (1st) 173059-U
No. 1-17-3059

SECOND DIVISION
November 17, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 09 CR 20719 02 |
| | ) | |
| DUJUAN POWE, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Stanley J. Sacks, |
| | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* The circuit court properly summarily dismissed defendant's petition for postconviction relief where defendant failed to set forth a claim that he was arguably prejudiced by his trial counsel's failure to subpoena his girlfriend's phone records, because the evidence of defendant's guilt was overwhelming, and the phone records would have carried little probative value as to defendant's telephonic confession, which was strongly corroborated by the State's other evidence.

¶ 2    This appeal arises from the summary dismissal of defendant Dujuan Powe's petition for

relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1, *et seq.* (West 2016)).

Defendant was convicted of first degree murder and aggravated kidnapping, and received

consecutive prison sentences of natural life for murder and 21 years for aggravated kidnapping. After successfully challenging his sentence for aggravated kidnapping on direct appeal, defendant's sentence for aggravated kidnapping was reduced to 15 years' imprisonment.

¶ 3    At defendant's jury trial, Taron Webb and Tasha Nash each testified that defendant called them and confessed to the murder of Kenyatae Collier. Webb testified that defendant made the confession using the phone of defendant's girlfriend, Benita Wallace. Nash, however, did not specify the phone that defendant used.

¶ 4    On this appeal, defendant argues that the circuit court erred in summarily dismissing his postconviction petition where he set forth an arguable claim of ineffective assistance of trial counsel. According to defendant, the grand jury testimony[1] of Webb and Nash specified that defendant made the confessions using Wallace's phone. Defendant claims that his trial counsel was ineffective for failing to subpoena Wallace's phone records, which would have shown these calls never occurred. We affirm.

¶ 5    I. BACKGROUND

¶ 6    Defendant was charged alongside his brother, co-defendant Darron Brewer, by a 71-count indictment, which included charges of first degree murder (720 ILCS 5/9-1(a)(1), (2), (3) (West 2016)), aggravated vehicular hijacking (*id.* § 18-4(a)(2), (3), (6) (West 2016)), and aggravated kidnapping (*id.* § 10-2(a)(2), (4), (8) (West 2016)),[2] following an incident in Chicago on October 26, 2009. Brewer received a jury trial simultaneously with defendant before a different jury.[3]

---

[1] The record before us does not contain the portion of the grand jury testimony in which Webb and Nash purportedly stated that defendant called them from Wallace's phone to make his confessions.

[2] The indictment also included a charge of solicitation of first degree murder (*id.* § 8-1.1(a) (West 2016)), which was only brought against co-defendant Brewer.

[3] Our records indicate that Brewer has filed two separate appeals designated case nos. 1-18-2638 and 1-20-0585. Brewer does not join in this appeal.

¶ 7     At trial, the State presented Taron Webb, defendant's cousin, who testified that in early October 2009, he met with defendant in Webb's bedroom. Defendant told Webb that defendant's brother, Brewer, was concerned Brewer's wife, Collier, would divorce him if she discovered Brewer was homosexual. Upon divorce, Brewer would be unable to receive money from Collier's life insurance policy. Therefore, Brewer wanted defendant to "strangle" Collier before she divorced Brewer. Defendant told Webb he "went to strangle" Collier, but "couldn't carry through with it" and instead engaged in sexual intercourse with Collier.

¶ 8     Later, on the night of October 26, 2009, defendant called Webb from his girlfriend Wallace's phone. Defendant told Webb, " 'I got her,' " and " 'I got that b***.' " Webb responded, " 'Oh, my god. Please don't tell me you did that.' " Webb could then hear noise in the background from defendant's end, someone asked defendant something, and defendant told Webb he would call Webb back. Defendant hung up the phone, and Webb "never heard from him." The next morning, Webb called the police with his aunt, Nash.

¶ 9     Webb additionally testified that one or two years before Collier's murder, defendant had worn a mask for Halloween similar to one depicted in a photograph the State entered into evidence. The photograph was described by other witnesses as depicting the mask worn in the film "Scream" ("Scream" mask). Webb also confirmed that photographs entered into evidence depicted Brewer and the vehicle that Brewer and Collier owned.

¶ 10    On cross-examination, Webb clarified that Collier had discovered Brewer was homosexual and had already threatened to divorce Brewer. Webb also clarified that defendant claimed he had had consensual sex with Collier when he first attempted to "strangle" Collier, and there was "no force."

¶ 11   The State also called Tasha Nash, who was the aunt of defendant, Brewer, and Webb. She testified that in the fall of 2009, Brewer drove a blue Chevrolet Monte Carlo and defendant did not have a vehicle. In the fall of 2009, Nash first learned that Brewer had a boyfriend named Josh.

¶ 12   Additionally, Nash stated that prior to Collier's death, Collier had accused defendant of raping her, and so Nash told defendant to call Collier "to find out what was going on." Defendant and Collier spoke on the phone in Nash's presence. During the conversation, Collier never raised her voice and did not accuse defendant of raping her, and defendant and Collier spoke in a "mild manner." Later, about three weeks before Collier's death, Nash had a "sit-down" with Brewer and defendant in Brewer's vehicle. In the vehicle, Brewer stated that Collier was going to tell the police defendant raped her at gunpoint. Defendant responded that he had "consensual sex" with Collier, and that Collier told defendant "she had feelings for him." Nash, Brewer, and defendant agreed that defendant would not be around Collier unless someone else was present.

¶ 13   Later, on October 25, 2009, defendant called Nash and asked her if she "had or knew someone with some .38 shells." Nash said she did not. On October 26, 2009, at about 10 p.m., defendant called Nash again sounding "[a]nxious and agitated" and asked Nash to pick him up. Nash refused and asked what was wrong. Defendant explained that his girlfriend, Wallace, "was vomiting everywhere and he couldn't take it." Nash was aware that Wallace was pregnant with defendant's baby, and Nash told defendant to give Wallace some peppermint. Defendant responded, " 'No, I got to get out of here. I got to go. I got to go, I need to leave here now.' "

¶ 14   When Nash asked what was wrong again, defendant stated multiple times, " 'I did something stupid.' " Nash asked what defendant did, and defendant stated that he took Collier's vehicle. Nash told him to return the vehicle, and defendant stated, " 'No, it's more than that.' " Defendant then told Nash that while Brewer and Collier were at a gas station, defendant

approached and pretended to carjack them. Defendant got into the vehicle, the vehicle was driven into an alley, and defendant put Collier in the trunk. Defendant then drove to Brewer's house and dropped Brewer and Brewer's children off. Next, he drove to another alley, opened the trunk of the vehicle, and Collier started getting out of the trunk. Collier begged defendant not to "do this to me" and stated, "I live for my kids," and "I love my kids." She then asked if she could "use the bathroom." Defendant allowed her to do so, and as she returned to the trunk he shot her in the head.

¶ 15    After defendant told this story, Nash hung up the phone. She initially did not call the police because she did not believe defendant story, as she thought "if you're going to kill somebody, why do you care if they use the bathroom." The next day, Nash saw a news story on the television that a woman was found in the trunk of a vehicle on the northwest side of Chicago, and a picture of the vehicle was televised. Nash testified that the vehicle looked like Brewer's vehicle, but it lacked a front license plate. Nash went to her mother's house and watched the 11 a.m. news with Webb, Nash's mother, and Nash's sister. Nash saw Collier's picture, pulled Webb to his bedroom to speak with him, and told Webb what she knew. On October 27, 2009, Nash went to the police station.

¶ 16    Charles Reed testified that on October 26, 2009 at about 12:38 a.m., he was working at a gas station on the 1200 block of West 58th Street. He was outside and heard what he believed to be a woman screaming for help. He looked towards a gas pump and saw a man scream, "Help, help." Reed saw another man wearing a "Scream" mask walk up to the man screaming and put his hand in his pocket "like he was going for a gun." The man screaming for help got into the driver's side, and the masked man entered the front passenger's seat. The vehicle drove out of the parking lot.

¶ 17    Reed believed he had witnessed a carjacking and called the police. The police responded to Reed's call, and in the afternoon two Chicago police detectives arrived and viewed video recordings of the carjacking. The State entered into evidence multiple photographs depicting the carjacking footage. Reed confirmed that in one photograph, the man who yelled for help was seen opening the trunk of the vehicle and looking into it. Another photograph also depicted the man wearing the "Scream" mask. In the early morning of October 27, 2009, Reed went to the police station and identified Brewer as the man who was yelling for help.

¶ 18    Theresa Jones, Collier's mother, testified that on October 26, 2009, between 11 a.m. and 12 p.m., Brewer arrived at Jones's apartment and took some clothes and diapers for his children. Jones asked Brewer if he had seen Collier, and Brewer said he had not seen Collier since 1 a.m., when she "dropped him off and *** kept going." Jones and Brewer agreed that if one of them saw Collier, they would call the other.

¶ 19    Defendant's girlfriend, Wallace, testified that as of October 25, 2009, she had been dating defendant for about six to eight months, and she was pregnant with a child she had with defendant. Wallace stated that one week before Collier's death, defendant had a "Scream" mask. She and defendant would wear the mask to "scare*** the kids in the house." After Collier was killed, Wallace never saw defendant's "Scream" mask again. Wallace further stated that defendant did not own a vehicle and Brewer would often pick defendant up and drop him off. Defendant also did not have a cell phone and used Wallace's phone.

¶ 20    On October 25, 2009, at about 11 p.m., she was at home with defendant and received a phone call for defendant. Wallace gave the phone to defendant. Then, defendant stepped out of the room for two or three minutes, returned to the room, gave the phone back to Wallace, and left. Wallace did not see defendant again until October 26, 2009, at about 7:30 or 8 a.m., when

defendant knocked on her bedroom window. Wallace let defendant in the house and returned to her bed with him. Wallace described her bed as "[f]ive mattresses stacked together against the wall by the window." Wallace confirmed that a photograph entered into evidence depicted a firearm placed between two mattresses. However, she stated that she had never seen the firearm before, that she had not known it was there, and that she never gave defendant permission to hide it between her mattresses. On October 27, 2009, at about 7 or 8 o'clock, defendant received a phone call and left. Wallace never saw him at her house again. Later, police officers recovered the firearm from between Wallace's mattresses, and Wallace went to the police station with the officers.

¶ 21    The State also called Joshua Maddox, whom other witnesses had stated was Brewer's boyfriend. Maddox testified that he met Brewer in the summer of 2009. Brewer drove a dark blue Chevrolet Monte Carlo, while Maddox drove a red Chrysler Sebring. He and Brewer "became friends and just hung out" until October 2009. On October 26, 2009, at about 6 a.m., Maddox woke up and saw he had received a text message and phone call from Brewer in the middle of the night. At about 7 a.m., Maddox called Brewer. Brewer told Maddox that his wife and vehicle were missing, and that he had called his wife but she did not respond. Maddox volunteered to take Brewer's children to daycare and arrived at Brewer's apartment at about 8 a.m. Defendant, Maddox, Brewer, and Brewer's children drove to the daycare center in Maddox's vehicle.

¶ 22    After going to the daycare center, Brewer drove them to the police station and entered the station for about 10 minutes while Maddox and Powe remained in the vehicle. They then drove to a "store front church," and defendant exited the vehicle holding a "balled up" object that looked like a jacket. Defendant went through a gate in the back side of the church and walked out of Maddox's sight. After a couple minutes, defendant returned to the vehicle. They dropped defendant off further down the block that the church was on. Maddox never saw defendant again.

¶ 23    Later on the night of October 26, at about 10:36 p.m., Maddox was driving Brewer to Brewer's apartment when they passed a Monte Carlo in an alley. Brewer stated, "I think I just saw my car." Maddox drove back to the Monte Carlo, exited his vehicle, and looked inside the Monte Carlo to see that it appeared "ransacked." Maddox returned to his vehicle and suggested that Brewer call the police. Brewer called the police, and the State entered into evidence a transcript of the phone conversation between Brewer and the police. The State also played a recording of the conversation. Maddox confirmed that in the conversation, Brewer never reported that he was carjacked the night before. About an hour after leaving Collier's Monte Carlo in the alley, Maddox went to the police station, and police told him that Collier had been shot in the head twice.

¶ 24    Maddox also confirmed that photographs of the "carjacking" at the gas station depicted a vehicle that looked like Brewer's Monte Carlo, and that Brewer was the man walking to the vehicle and opening the trunk. Maddox denied that Brewer ever told Maddox he was carjacked that night.

¶ 25    On cross-examination, Maddox confirmed that his relationship with Brewer in 2009 remained a "friendship," but that "at some point it got intimate." Additionally, Maddox confirmed that when defendant exited Maddox's vehicle holding the "balled up" object, Maddox could not recall whether defendant returned with the object. When Brewer and Maddox found Brewer's Monte Carlo in the alley, Brewer had suggested the route that led them there. Also in cross-examination, Maddox stated he did not know Brewer was married until the night of October 26, 2009, when he and Brewer were taken to the police station.

¶ 26    Chicago police forensic scientist Jennifer Belna testified that she examined a buccal swab sample from defendant, Brewer, Maddox, and Collier, and she examined swabs from a firearm. Belna was unable to obtain a full DNA profile from the firearm, and she concluded that defendant, Brewer, Maddox, and Collier did not contribute to the low level DNA profile on the firearm.

¶ 27    Chicago police officer Mariusz Chojnacki testified that on October 26, 2009, he and his partner received an assignment to meet up with a caller in a red Chrysler Sebring. They received information that a vehicle had been discovered in an alley near the caller's location. They located the vehicle in the alley, which was empty with the driver's door unlocked, but did not find the caller who reported the vehicle. The officers opened the trunk and found a woman "laying face up in the trunk *** with dry blood stains on her face and upper body." Chicago police officer Scott Korhonen testified that on October 27, 2009, at about 10 p.m., he and seven or eight other officers went to Wallace's house to find defendant, who was a "wanted individual." Wallace's mother met with the officers and signed a consent to search form. The officers searched Wallace's bedroom and found a handgun in between a stack of mattresses, as well as clothing, a bag, and a wallet containing defendant's identification. The State entered into evidence the consent to search form, as well as photographs of Wallace's bedroom and the firearm found in the bedroom.

¶ 28    Chicago police forensic scientist Kathleen Gahagan testified regarding video footage depicting the alley on the 2200 block of North Tripp Avenue, where the blue Chevrolet Monte Carlo containing Collier's body was found. Gahagan further testified that a temporary license plate was also found in the trunk of the vehicle. During Gahagan's direct examination, the State presented photographs of the scene, including one photograph reflecting that the Chevrolet's front license plate was missing, one photograph reflecting a license plate on the rear of the vehicle, and one photograph reflecting the vehicle's vehicle identification number on the front dashboard. Chicago police evidence technician Matthew J. Savage testified that he processed the blue Chevrolet Monte Carlo and found fingerprints on the top of the inside of the trunk. On cross-examination, Savage clarified that three fingerprints were lifted from the trunk's interior, one was lifted from the trunk's exterior, and four were lifted from the interior rear view mirror.

¶ 29    Illinois state police forensic scientist Joseph Wohrstein testified that he received seven fingerprint lift cards, and that prints lifted from the interior of the trunk matched Collier's fingerprint. On cross-examination, Wohrstein confirmed that the prints did not match with Brewer or defendant.

¶ 30    Illinois state police trace evidence analyst Robert Berk testified that he received a glove entered into evidence that had been recovered from Wallace's bedroom. He tested the glove for gunshot residue but only found two of the three "tri-component particles" necessary to make a positive finding for gunshot residue. He thus concluded that "the sampled area of the glove may not have contacted a [gunshot residue] related item or may not have been in the environment of the discharged firearm." He also stated that if it was in the environment of the discharged firearm, the particles "were removed by activity or *** not detected by the procedure."

¶ 31    Cook County assistant medical examiner Joseph Lawrence Cogan testified that he performed Collier's autopsy, observed two gunshot wounds to Collier's head that caused "extensive fracturing" to Collier's skull, and recovered two bullets from Collier's head. Cogan also observed evidence of "close-range firing," meaning that the muzzle of the firearm was 18 inches or less from the surface of the skin. Cogan concluded that Collier's cause of death was "multiple gunshot wounds," and the death was classified as a homicide. Cogan also confirmed that Collier's wounds were consistent with the evidence that Collier was shot while in the trunk of a vehicle by a shooter standing outside the trunk within close range.

¶ 32    Illinois state police forensic scientist Justin Barr testified that he received the firearm that was recovered from the mattresses in Wallace's bedroom. He confirmed that the firearm could fire .38 shells. Barr opined that the bullets recovered from Collier's head were fired from the firearm recovered from the mattresses in Wallace's bedroom.

¶ 33   Chicago police detective Anthony Noradin stated that on October 27, 2009, at about 12:10 a.m., he and a partner went to the alley where the blue Chevrolet Monte Carlo containing Collier's body was found, at the 2200 block of North Tripp Avenue. Examining the license plate of the vehicle, he identified Brewer as the vehicle's registered owner. At about 12:20 p.m., a phone interview with Webb was conducted, and Noradin and a partner picked up Webb at a gas station. Noradin formally interviewed Webb at the police station, and also interviewed Brewer, who was not yet under arrest. At about 8:40 p.m., Noradin and two other detectives conducted an interview with Nash. Noradin also confirmed that interviews were conducted with Wallace and Maddox, and that Reed, the gas station employee, identified Brewer from a lineup as being the victim of the recorded carjacking. On October 29, 2009, at about 10 p.m., defendant turned himself into the police station and was formally arrested.

¶ 34   Chicago police detective Jose Cardo testified that on October 27, 2009, he and Detective Gonzalez[4] conducted two interviews with Brewer at about 1:15 p.m. and 2:40 p.m. respectively. He then went to the gas station where Reed worked, met with Reed, and watched surveillance footage of the carjacking. Cardo identified Brewer in this footage.

¶ 35   The parties stipulated that if called to testify, Ann Louise Ford, the corporate vice president for the New York Life Insurance Company, would testify regarding two exhibits: (1) a group life insurance policy covering the life of Collier in the amount of $100,000 as a spouse of Brewer as an insured National Guard member; and (2) a group life insurance policy that covered the life of Collier in the amount of $5,000 as the spouse of Brewer as an insured member of the military. Illinois Army National Guard Sergeant Sarah Campbell also testified regarding the details of these documents. The parties also testified that a Chicago police officer recovered from Wallace's

---

[4] Detective Gonzalez's first name does not appear in the transcript of the trial proceedings.

bedroom a handgun, a bag containing men's clothing, a pair of men's gym shoes, a pair of men's gloves, a duffel bag, a wallet, and a hat.

¶ 36    The State rested.

¶ 37    The defense called on defendant's behalf Chicago police detective Donald Falk, who testified that on October 29, 2009, at about 1:41 a.m., he interviewed Collier's mother, Jones, to determine whether Collier had ever mentioned being raped. Jones had no knowledge that Collier had been raped. Falk also confirmed that at some point prior to her death, he had interviewed Collier, who confirmed that she had had problems with Brewer "for a while."

¶ 38    The jury found defendant guilty of first degree murder and aggravated kidnapping.

¶ 39    Defendant filed a motion for new trial alleging, *inter alia*, (1) that the State failed to prove him guilty beyond a reasonable doubt; (2) that the circuit court erred in granting the State's motion *in limine* to admit co-conspirator statements and proof of other crimes evidence; (3) that the circuit court erred in not allowing the defense a continuance to retrieve Brewer's phone records; and (4) the circuit court erred in allowing Nash to testify regarding her conversation with Brewer, in which they discussed Collier's accusation that defendant raped her. Additionally, defendant filed a supplemental motion for new trial, arguing, *inter alia*, (1) that the circuit court erred in barring defendant from introducing evidence regarding his lack of criminal convictions; (2) that the circuit court erred in overruling defendant's objection to the introduction of evidence regarding Reed's phone call to the police; and (3) that the State "made improper comments that Taron Webb and Tasha Nash were credible because they were not jail house informants." The court denied defendant's motions.

¶ 40    The circuit court imposed on defendant prison sentences of natural life for one count of first degree murder and 21 years for aggravated kidnapping.

¶ 41 On direct appeal, defendant argued that (1) the State misstated expert witness testimony in closing argument; (2) his life sentence for murder was excessive; and (3) the circuit court misapprehended the applicable sentencing range for defendant's aggravated kidnapping conviction. On March 30, 2016, we remanded the case for resentencing on defendant's aggravated kidnapping conviction, but otherwise affirmed the circuit court's judgment. *People v. Powe*, 2016 IL App (1st) 133205-U. On March 10, 2017, defendant's sentence for aggravated kidnapping was reduced to 15 years' imprisonment.

¶ 42 On April 3, 2017, defendant filed a *pro se* postconviction petition, alleging that his trial counsel provided ineffective assistance by failing to obtain Wallace's phone records. According to defendant, these phone records would have shown defendant never made the calls to Nash or Webb on October 26, 2009, in which defendant confessed to Collier's murder. He claimed that he had requested his trial counsel several times to subpoena Wallace's phone records, but his "claims were met with excuses and disbelief," and his trial counsel never subpoenaed the records. Defendant also claimed that he had "attempted to obtain the phone records but thus far has been unsuccessful." He alleged that Wallace had obtained the records and defendant's mother, Roxanne Brough, mailed them to defendant's trial counsel. However, defendant's trial counsel never received them. Defendant claimed that he had "continuously requested" that Wallace retrieve the records again, but Wallace had not been able to because the account was not in her name. Defendant further alleged that he was not able to obtain an affidavit from Wallace or Brough because Wallace was "uncooperative" and Brough "claims to have mailed the affidavits to [defendant] but [defendant has] yet to receive them."

¶ 43 Defendant also alleged that his counsel on direct appeal was ineffective for failing to raise an ineffective assistance claim that defendant's trial counsel failed to impeach Webb with the video

recording of his interrogation and with the testimony of Noradin. Defendant claimed that in prior statements to the police, Webb never mentioned the conversation he had with defendant in Webb's bedroom three weeks before the incident. According to defendant, his trial counsel was additionally ineffective for failing to cross-examine Webb to elicit a statement Webb made to police that he " '*believed* Brewer and [defendant] planned to kill Collier to collect on a life insurance policy.' " (Emphasis in original.) Further, defendant claimed that his counsel on direct appeal was ineffective for failing to raise an ineffective assistance claim that defendant's trial counsel failed to impeach Nash on prior inconsistent statements Nash made to the police. According to defendant, Nash had previously told the police of defendant's confession, but "never referenced Brewer or his children being present; the car-jacking; or the gas station."

¶ 44    In support of this petition, defendant provided an affidavit, in which he alleged:

"In the year of 2010, sometime in the month of October my attorney *** came to visit me in the Cook County Jail. During the visit [my attorney] showed me the Grand Jury Transcripts where both Tasha Nash & Teron Webb testified that I called [both] cellphone[s] & confessed to the murder of Kenyatae Collier. Tasha Nash testified that I called on 10/26/09 at 10 pm from my then girlfriend Benita Wallace's phone number ***. Teron Webb also testified that I called him on 10/26/09 at 7:30 pm & confessed to the murder. Unlike Nash, Webb did not state at the grand jury which number I allegedly called from. However, this was clarified at trial when Webb testified that I called from Benita Wallace['s] phone number. After reviewing the testimony of both Nash & Webb, I told my attorney *** he needs to subpoena Benita Wallace's phone records because I never called Nash or Webb & confessed to the murder of Kenyatae Collier. The records will show that no call was placed from Benita Wallace's phone number *** to either Tasha Nash nor [*sic*]

Teron Webbs' phone on the date or time each \*\*\* witness testified to. This would definitively prove that neither conversation took place & that both individuals perjured themselves before the grand jury & trial jury.

I as well as my mother Roxanne Brough has tried to contact Benita Wallace to get the phone records but she has not returned any of my letters or phone calls nor the visits from my family. At the time of the filing Roxanne Brough claims to have mailed an affidavit to me but I [have] yet to receive them."

¶ 45    On June 21, 2017, the circuit court summarily dismissed defendant's postconviction petition. The circuit court found that defendant's claim based on trial counsel's failure to obtain Wallace's phone records was speculative, frivolous, and patently without merit "because [defendant] does not attach an affidavit from Wallace or any records or affidavits tending to show that the phone calls were never made." The court additionally held that defendant failed to support his assertion that Wallace mailed him phone records or that she was unable to obtain new records. Further, the court found defendant failed to establish that his trial counsel was ineffective for not obtaining the phone records, or that defendant was prejudiced by the failure. As to the alleged failure of defendant's trial counsel to cross-examine and impeach Webb and Nash regarding their alleged inconsistent statements, the court found that the defense counsel's cross-examination of Webb was a matter of trial strategy. The court also held defendant had failed to show his trial counsel's decision in cross-examining these witnesses resulted in prejudice, when the evidence against defendant was "overwhelming." (Internal quotation marks omitted.)

¶ 46    This appeal followed.

¶ 47    II. ANALYSIS

¶ 48 On appeal, defendant argues that the circuit court erred in summarily dismissing his postconviction petition, where he set forth an arguable claim of ineffective assistance. Defendant asserts that his trial counsel was ineffective for failing to subpoena Wallace's phone records, which would have shown that defendant "did not use Wallace's phone to call Tasha Nash and Taron Webb to confess to the murder of Kenyatae Collier." The State responds that the circuit court properly summarily dismissed defendant's petition because defendant forfeited the issue by failing to raise it on direct appeal, and because defendant failed to set forth an arguable claim that his counsel was deficient and that he was prejudiced by the deficiency.

¶ 49 The Act (725 ILCS 5/122-1, *et seq.* (West 2016)) provides a remedy for criminal defendants whose constitutional rights were substantially violated at trial or sentencing. *People v. Dupree*, 2018 IL 122307, ¶ 28. During first-stage proceedings under the Act, the circuit court must determine whether the defendant's postconviction petition is " 'frivolous or is patently without merit.' " *People v. Boykins*, 2017 IL 121365, ¶ 9 (quoting 725 ILCS 5/122-2.1(a)(2) (West 2016)). The court may summarily dismiss a postconviction petition as frivolous or patently without merit only where the petition "has no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). A petition has "no arguable basis either in law or in fact" where it "is based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* at 16. "An example of an indisputably meritless legal theory is one which is completely contradicted by the record," and "[f]anciful factual allegations include those which are fantastic or delusional." *Id.* at 16-17.

¶ 50 During first stage postconviction proceedings, "the court treats allegations of fact as true so long as those allegations are not affirmatively rebutted by the record." (Internal quotation marks omitted.) *People v. White*, 2014 IL App (1st) 130007, ¶ 18. In first-stage postconviction proceedings, "the petition cannot be said to be at issue," and the circuit court acts "strictly in an

administrative capacity by screening out those petitions which are without legal substance or are obviously without merit." (Internal quotation marks omitted.) *People v. Tate*, 2012 IL 112214, ¶¶ 9-12. The Illinois Supreme Court requires that courts review *pro se* postconviction petitions "with a lenient eye, allowing borderline cases to proceed." (Internal quotation marks omitted.) *Hodges*, 234 Ill. 2d at 21. We review *de novo* the summary dismissal of a postconviction petition. *Id.* ¶ 10.

¶ 51  A criminal defendant has the constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution (U.S. Const., amends. VI, XIV) and the Illinois Constitution (Ill. Const. 1970, art. I, § 8). *People v. Domagala*, 2013 IL 113688, ¶ 36. To succeed on an ineffective assistance of counsel claim, a defendant must establish that "counsel's performance was deficient," and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). More specifically, "a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). During first-stage postconviction proceedings, the circuit court may not summarily dismiss a postconviction petition if "(i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17.

¶ 52  A. Forfeiture

¶ 53  We first address the State's contention that defendant forfeited this issue by failing to raise it on direct appeal. As the State observes, defendant also did not set forth a claim in his petition that his counsel on direct appeal was ineffective for failing to argue that trial counsel was

ineffective for not subpoenaing Wallace's phone records. Rather, the claim as alleged in the postconviction petition only alleges the ineffective assistance of trial counsel. We find the State's argument of forfeiture to be without merit.

¶ 54 Postconviction proceedings are intended "to allow inquiry into constitutional issues involved in the original conviction and sentence that have not been, and could not have been, adjudicated previously on direct appeal." *People v. Towns*, 182 Ill. 2d 491, 502 (1998). "[I]ssues that could have been raised on direct appeal, but were not, are forfeited." *People v. English*, 2013 IL 112890, ¶ 22. However, the doctrines of forfeiture and waiver are relaxed "where the facts relating to the claim do not appear on the face of the original appellate record." *People v. Harris*, 206 Ill. 2d 1, 13 (2002).

¶ 55 Defendant's claim clearly concerns facts that were not contained in the original appellate record. Namely, defendant claims that he requested his trial counsel to obtain Wallace's phone records, which would have shown that defendant never used Wallace's phone to make the two calls on October 26, 2009, in which defendant confessed to Collier's murder. However, according to defendant, defendant's trial counsel never obtained the phone records. Neither defendant's discussions with his trial counsel nor Wallace's phone records were contained in the original appellate record, and so this court will relax the doctrine of forfeiture. *Id.*

¶ 56 To support its forfeiture argument, the State cites *People v. Gale*, 376 Ill. App. 3d 344 (2007), and *People v. Dominguez*, 366 Ill. App. 3d 468 (2006). Both are distinguishable. In *Gale*, the defendant asserted that his trial counsel was ineffective for "fail[ing] to obtain his mental health records where such records could have given rise to a *bona fide* doubt of his fitness to stand trial and could have served as mitigation at sentencing." *Gale*, 376 Ill. App. 3d at 348. However, as this court noted, evidence regarding the defendant's mental health had been presented at the

defendant's sentencing hearing, and the defendant had already argued on direct appeal that the trial court failed to conduct a competency hearing based on the defendant's mental health. *Id.* at 347, 349. Here, unlike in *Gale*, there was no evidence in the original appellate record regarding the contents of Wallace's phone records or defendant's conversations with his trial counsel regarding the records.

¶ 57    *Dominguez* is also clearly distinguishable, as the defendant in *Dominguez* conceded on collateral appeal that he had forfeited his claim by failing to raise it on direct appeal, but claimed fundamental fairness required this court to consider the issue. *Dominguez*, 366 Ill. App. 3d at 474. The fact that the defendant had forfeited his claim was not even at issue.

¶ 58    As stated, defendant's claim is based on facts that were not contained in the record on direct appeal, and so defendant could not have previously raised his current ineffective assistance claim. Therefore, we relax the doctrine of forfeiture. *Harris*, 206 Ill. 2d at 13. We find that defendant has not forfeited the issue on this appeal and will therefore consider its merits.

¶ 59    B. Failure to Provide Sufficient Evidence

¶ 60    Throughout its brief, the State argues defendant failed to sufficiently support his postconviction claim with various pieces of evidence. Specifically, defendant failed to submit a transcript of the grand jury testimony, despite claiming that Webb and Nash testified before a grand jury that defendant used Wallace's phone when he confessed to Collier's murder. The State also argues that defendant failed to provide Wallace's phone records, and failed to set forth any corroboration that his trial counsel did not try to subpoena or investigate Wallace's phone records.

¶ 61    "To survive first-stage dismissal, a *pro se* petitioner need only present the gist of a constitutional claim, which is a low threshold requiring only a limited amount of detail in the petition." (Internal quotation marks omitted.) *People v. Jones*, 211 Ill. 2d 140, 144 (2004). "[A]

*pro se* petitioner is not required to allege facts supporting all elements of a constitutional claim to survive summary dismissal." *People v. Brown*, 236 Ill. 2d 175, 188 (2010). The threshold of stating a claim at the first stage of postconviction proceedings is low "[b]ecause most petitions are drafted at this stage by defendants with little legal knowledge or training." *Tate*, 2012 IL 112214, ¶ 9. It is not until the second stage that a postconviction petition "can be said to be at issue, with both sides engaged and represented by counsel." *Id.* ¶ 10.

¶ 62    Defendant's postconviction petition included an affidavit, which alleged that Webb and Nash both submitted grand jury testimony that defendant called them on Wallace's phone and confessed to Collier's murder. However, defendant alleged that Wallace's phone records would show that the calls were never made from her phone. Defendant also alleged that he requested that his trial counsel obtain Wallace's phone record, but his counsel never did so. Defendant allegedly attempted to obtain Wallace's phone records as well and was told they were sent to him, but he never received them.

¶ 63    Taking defendant's allegations as true, we find that defendant's failure to corroborate his *pro se* petition with further exhibits does not alone render his petition insufficient to state the gist of a constitutional claim. *Jones*, 211 Ill. 2d at 144.

¶ 64    C. Deficiency of Performance

¶ 65    The State also argues that defendant failed to set forth an arguable claim that defendant's counsel was deficient.

¶ 66    Under the deficiency prong of the *Strickland* test, "a defendant must overcome a strong presumption that, under the circumstances, counsel's conduct might be considered sound trial strategy." *People v. Houston*, 226 Ill. 2d 135, 144 (2007). "It is well settled that strategic choices made by defense counsel after a thorough investigation of the laws and facts relevant to the

plausible options are virtually unchallengeable." (Internal quotation marks omitted.) *People v. King*, 316 Ill. App. 3d 901, 913 (2000). However, "[a]ttorneys have an obligation to explore all readily available sources of evidence that might benefit their client." (Emphasis and internal quotation marks omitted.) *People v. Irvine*, 379 Ill. App. 3d 116, 130 (2008). Even trial counsel's "tactical decisions may be deemed ineffective when they result in counsel's failure to present exculpatory evidence of which he is aware." *King*, 316 Ill. App. 3d at 913.

¶ 67    The State concedes that, under precedent from our supreme court, arguments that a trial counsel's alleged ineffective assistance was a matter of reasonable trial strategy is "inappropriate for the first stage," and is "more appropriate to the second stage of postconviction proceedings, where both parties are represented by counsel, and where the petitioner's burden is to make a substantial showing of a constitutional violation." *Tate*, 2012 IL 112214, ¶ 22. Nonetheless, the State suggests that we disregard *Tate* in favor of more recent rulings, in which the State claims this court has affirmed summary dismissals based on a finding that the trial counsel's ineffective assistance was a matter of trial strategy.

¶ 68    We find that each of the rulings cited by the State are distinguishable, as they concern instances in which the record affirmatively rebutted the defendant's ineffective assistance claim, or instances in which this court affirmed a summary dismissal on other grounds. *People v. Knapp*, 2019 IL App (2d) 160162, ¶¶ 38-41 (upholding summary dismissal of the defendant's claim that his trial counsel ineffectively disallowed him from testifying at trial where the record showed (1) that the trial counsel stated they had discussed the defendant's decision not to testify " 'at great length' "; (2) that the circuit court admonished the defendant as to his decision not to testify; and (3) that the defendant expressly made a knowing and intelligent waiver of his right to testify); *People v. Brown*, 2017 IL App (1st) 150203, ¶ 28 (finding the defendant had forfeited his

ineffective assistance claim that his trial counsel failed to investigate or obtain a knife that the victim allegedly held during the incident, which allegedly would have supported the defendant's self-defense claim); *People v. Shipp*, 2015 IL App (2d) 131309, ¶ 11 (affirming the summary dismissal of the defendant's ineffective assistance claim that his trial counsel failed to impeach a witness with a prior inconsistent statement, where the record affirmatively showed that the trial counsel had impeached that witness "to the extent possible").

¶ 69    Here, defendant alleges that he asked that his trial counsel to obtain Wallace's phone records, because they would have shown that defendant never used Wallace's phone to call Webb and Nash and confess to Collier's murder. However, defendant claims that his trial counsel failed to obtain the phone records despite defendant's multiple requests for his counsel to do so. We make no finding as to whether trial counsel's assistance was ineffective for not obtaining Wallace's phone records, as such an inquiry is only appropriate for second stage postconviction proceedings. *Tate*, 2012 IL 112214, ¶ 22. We therefore find that, for purposes of first-stage postconviction proceedings, defendant sufficiently set forth an arguable claim that his trial counsel's representation was deficient.

¶ 70    D. Prejudice Suffered by Deficiency

¶ 71    The State also asserts that defendant failed to set forth an arguable claim that he was prejudiced by the alleged ineffectiveness of his counsel at trial and on direct appeal.

¶ 72    As we have stated, to establish the prejudice prong of the *Strickland* test, the defendant must show there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Domagala*, 2013 IL 113688, ¶ 36. A showing of "reasonable probability" here requires the showing of "a probability sufficient to undermine confidence in the outcome," or put another way,

a showing "that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Proof of prejudice "cannot be based on mere conjecture or speculation as to outcome." *People v. Palmer*, 162 Ill. 2d 465, 481 (1994). However, it is not until the second stage of postconviction proceedings that a petitioner is required "to 'demonstrate' or 'prove' ineffective assistance by 'showing' that counsel's performance *** prejudiced the defense." *Tate*, 2012 IL 112214, ¶ 19. "[A] confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable." (Internal quotation marks omitted.) *People v. Simpson*, 2015 IL 116512, ¶ 36.

¶ 73 We find that defendant has failed to set forth an arguable claim of prejudice, as the evidence against defendant at trial was overwhelmingly strong, and Wallace's phone records would only challenge a small portion of this evidence. Specifically, taking defendant's allegations regarding the phone records as true, the records would merely show (1) that defendant did not specifically use *Wallace's* phone to call Webb and Nash, and (2) that the calls did not take place at the times Webb and Nash testified that defendant called them. This does not necessitate a finding from a jury that the calls never occurred at all, and the jury could still conclude that the calls were made from a different phone or took place at a different time. As such, Wallace's phone records would at best establish very little.

¶ 74 Also significant is the fact that the State entered into evidence other instances in which defendant discussed facts pertaining to Collier's murder. Therefore, even if a jury were to conclude the two phone calls to Webb and Nash on October 26, 2009, did not occur, there was still strong evidence regarding highly incriminating statements made by defendant. Specifically, Webb testified that in early October 2009, he met with defendant in person. Defendant told him Brewer wanted defendant to "strangle" Collier so that Brewer could obtain the proceeds from Collier's life

insurance policy. Nash also testified that on October 25, 2009, defendant called her and asked if she "had or knew someone with some .38 shells." Using Wallace's phone records to impeach Webb and Nash as to two other phone conversations would not necessarily affect the credibility of these other pieces of testimony.

¶ 75     We also note that if Wallace's phone records were presented to a jury to show that defendant never called Nash using Wallace's phone, such evidence would not address the fact that Nash's testimony describing defendant's confession was closely corroborated by the State's other evidence. Nash testified that on October 26, 2009, at about 10 p.m., defendant called her and stated that while Brewer and Collier were at a gas station, defendant walked up to them and pretended to carjack them. Defendant also told Nash that he drove Brewer's vehicle into an alley, placed Collier in the trunk, dropped Brewer off at Brewer's house, drove to another alley, and shot Collier in that alley. This testimony was closely corroborated with photographs of video footage, which showed that on October 26, 2009, at about 12:38 a.m., a man identified as Brewer was apparently carjacked at a gas station by a man in a "Scream" mask. The testimony of a gas station worker reflected that Brewer was seen opening the trunk of his vehicle and looking into it at one point. Brewer's vehicle was later found in an alley, and Collier's body was found in the trunk.

¶ 76     Moreover, as this court has previously observed, the general evidence of defendant's guilt was overwhelming. *Powe*, 2016 IL App (1st) 133205-U, ¶ 29. In corroboration with Nash's testimony that defendant called her and asked how to obtain ".38 shells," the State also entered evidence that the bullets recovered from Collier's head were fired from a firearm that could fire ".38 shells." The State even presented evidence that the bullets recovered from Collier's head were fired from the specific firearm that was recovered from between the mattresses in Wallace's bedroom. Wallace testified that the morning after Collier was murdered, defendant stopped by

Wallace's house and got into bed with Wallace. Based on this testimony, a jury could have certainly concluded that defendant hid the firearm used to shoot Collier in between Wallace's mattresses at that time. Further, Webb and Wallace testified that defendant owned a "Scream" mask much like the mask worn by the apparent carjacker in the surveillance footage at the gas station.

¶ 77    In light of the overwhelming, substantially corroborated evidence of defendant's guilt, and the limited value Wallace's phone records would have had in challenging that evidence, we find that defendant failed to set forth a claim that he was arguably prejudiced by trial counsel's failure to subpoena Wallace's phone records. See *People v. Lewis*, 2017 IL App (1st) 150070, ¶ 29 (finding the defendant failed to set forth a claim that he was arguably prejudiced by trial counsel's failure to investigate and present exculpatory evidence, where the evidence of the defendant's guilt was "strong," and the victim's testimony was "substantially corroborated" by other evidence); see also *People v. Douglas*, 2011 IL App (1st) 093188, ¶ 22, 36 (finding the defendant failed to state a claim that he was arguably prejudiced by his trial counsel's failure to object to the admission of the defendant's custodial statements, when the incriminating evidence "left [the reviewing court] with no concern that the defendant was wrongly convicted" (internal quotation marks omitted)). As such, we affirm the judgment of the circuit court summarily dismissing defendant's postconviction petition.

¶ 78    III. CONCLUSION

¶ 79    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 80    Affirmed.